BOARD OF DIRECTORS OF PLUM BAYOU LEVEE DIST. v. ROACH et al.†

(Circuit Court of Appeals, Eighth Circuit.   November 19, 1909.)

No. 3,031.

**1.** LEVEES (§ 16*)—CONTRACT FOR CONSTRUCTING LEVEE—ACTION FOR BREACH.

In a contract with the directors of a levee district for the construction of a levee by plaintiffs along the front of the Arkansas river, as shown on maps and profiles made by the board's engineer, to be paid for in accordance with his measurement of the work, a provision that any change in the alignment of the levee made by the engineer should not entitle plaintiffs to any allowance beyond the final measurement of the work did not cover a change from the original line along the bank of the river on dry ground to a course half a mile back on swampy ground; and where such change was agreed to by plaintiffs on agreement by the engineer that the board should obtain right of way for a ditch to drain the swamp, for the construction of which plaintiffs were to receive under the contract the same pay as for moving the same quantity of earth on the levee, which agreement was not kept, and by reason thereof the cost of the work in the new location was doubled, plaintiffs were entitled to recover such extra cost as damages for breach of the agreement.

[Ed. Note.—For other cases, see Levees, Dec. Dig. § 16.*]

**2.** LEVEES (§ 16*)—CONTRACT FOR CONSTRUCTION OF LEVEE—POWERS OF ENGINEER.

Where plaintiffs contracted with defendant, a levee board, to construct a levee, defendant to procure right of way for the levee and all necessary borrow pits and drainage ditches, the contract providing that defendant's engineer should have supervision of the work with authority to make changes in the alignment on his making a considerable change which made it necessary for the proper prosecution of the work that a ditch should be made to drain a swamp through which the new route passed, his agreement that defendant would procure right of way therefor was within his powers and bound defendant, and was not a new contract within a by-law of defendant requiring construction contracts to be in writing.

[Ed. Note.—For other cases, see Levees, Cent. Dig. § 6; Dec. Dig. § 16.*]

**3.** DAMAGES (§ 125*)—BREACH OF CONTRACT TO PAY MONEY—MEASURE OF DAMAGES.

Where a levee board was unable to make payments on a contract for the construction of a levee when they matured, but issued to the contractors certificates of indebtedness bearing interest which the contractors sold at a discount, they were not entitled to recover from the board as damages for breach of the contract the amount of such discount; the measure of such damages being the interest which was provided for in the certificates.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 340; Dec. Dig. § 125.*]

**4.** WORDS AND PHRASES—"ALIGNMENT."

The word "alignment" used with reference to a system of drainage means the ground plan of the work.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 1, p. 307.]

In Error to the Circuit Court of the United States for the Eastern District of Arkansas.

Action by M. J. Roach and Walker Stansell, partners, as Roach & Stansell, against the Board of Directors of the Plum Bayou Levee District. Judgment for plaintiffs, and defendant brings error. Affirmed on condition.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied March 4, 1910.

Charles T. Coleman (George W. Murphy, William F. Coleman, and W. M. Lewis, on the brief), for plaintiff in error.

W. B. Smith (J. M. Moore and T. Merrick Moore, on the brief), for defendants in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and WM. H. MUNGER, District Judge.

WM. H. MUNGER, District Judge. For convenience in the statement of this case, plaintiff in error will be called defendant and defendants in error plaintiffs.

The defendant, Plum Bayou Levee District, was created by an act of the General Assembly of the state of Arkansas (Laws 1905, p. 83), entitled:

"An act to lay off and establish parts of Pulaski, Lonoke and Jefferson counties, Arkansas, into a levee district, to be known as the Plum Bayou Levee District, for the erection and maintenance of a levee in said district, to incorporate a board of levee directors for said district, and for other purposes."

Said act became effective February, 13, 1905. The act named the individuals who should compose the first board of directors

It was also provided that:

"The directors herein named and their successors in office shall constitute, and are hereby declared to be, a body politic and corporate, by the name and style of Board of Directors of Plum Bayou Levee District, and by that name may sue and be sued, plead and be impleaded."

By the act it was provided:

"Said board of levee directors hereby created shall organize by electing a president, vice president, a secretary, a treasurer, a chief engineer, and such other officers as may be necessary to carry out the purpose of this act, and prescribe the duties and fix the salaries of said officers."

The act not only empowered the board of directors, but made it their duty, to levee the Arkansas river front between certain points in the act named, and they were authorized to exercise the right of eminent domain for the purpose of building, erecting, and maintaining a levee through, over, and across the land of any individual, firm, or corporation in said district. All contracts for the construction of levees were to be let to the lowest responsible bidder after advertising for 30 days, except in case of a break in the levee or a break threatened by a caving bank or for other cause demanding immediate attention. The act provided that all work let or contracted for by the board as therein provided for, excepting emergency work, should be executed according to the plans and specifications furnished by said board and made a part of the contract, and should be performed under the supervision and to the satisfaction of the chief engineer.

The board organized as provided by the act, and elected, among other officers, a chief engineer, adopted by-laws, one defining the duties of the engineer as follows:

"Supervision of all service, locations, maps, and profiles and estimates of all construction, and such other duties as may properly come within his department."

Another by-law, No. 9, was as follows:

"All contracts made by the president or other officers or other agents of the board shall be in writing; otherwise of no legal effect."

On the 23d day of March, 1905, the board of directors of defendant, having theretofore advertised for bids for the purpose, entered into a contract with plaintiffs to construct some 18 miles of levee, as shown by maps and profiles then in the office of said board of directors, at the agreed price of 12¼ cents per cubic yard, the work to be constructed and finished as described in the specifications attached to and made a part of the contract, and agreeably to the direction from time to time of the chief engineer and his assistants. The contract provided that, if plaintiffs should refuse or neglect to prosecute the work with force sufficient in the opinion of the chief engineer for its completion within the time specified in the agreement, the engineer was authorized to employ such force as in his opinion might be necessary to insure the completion of the work within the time limited, at such wages as he might find it necessary or expedient to give, at the expense of plaintiffs, or the chief engineer might declare the contract, or any portion or section embraced therein, forfeited.

The contract contained also the following provision:

"It is expressly understood that the prices herein stipulated to be paid refer to final and accurate measurement of the work embraced in this contract, and it is further understood that the quantities and values of work embraced in this contract, at the date of its ratification, as shown on the plans and profiles, are only approximate, and no subsequent diminution or increase in the amount of work that may arise either from error in the original estimate, or from any change that may be made in the gradients or alignment, shall entitle the parties of the second part to any allowance whatever beyond the final measurement of the work."

The contract provided that:

"Between the 1st and 5th of each month during the progress of this work, or as near thereafter as possible, an estimate shall be made of the quantity and relative value of the work done by the chief engineer and furnished to the president, who shall pay to the parties of the second part eighty-five per cent. of the estimate in cash, the fifteen per cent. being retained to guarantee the prompt and proper completion of the work."

In the specifications it was provided:

"That drains, ditches, and channels for streams, when necessary for the proper execution of the work, must be made by the contractor, as directed by the engineer."

"Excavation for drainage of borrow pits, when directed, shall be included in the estimate of yardage and paid for at the contract price."

"The engineer shall have power to designate the exact locality at which the work shall be prosecuted."

"This agreement is made with the understanding that the right of way and earth for constructing the levee will be furnished by the Board of Directors of the Plum Bayou Levee District, but no claim for damage or expense is to be made by the contractor on account of delay or failure in securing such right of way. In case of such delay or failure to secure the right of way, recommendation for proper extension of the contract will be made in the discretion of the party of the first part."

"The specifications, if not understood, will be fully explained by the chief engineer."

"The decision of the engineer, officer in charge, as to the quality and quantity shall be final."

During the progress of the work it was concluded that at a point where the line of the levee, as shown on the map and profile, ran along the river bank in front of a cypress brake, a change should be made. This brake comprised from 10 to 15 acres. The chief engineer at first thought that the line ought to be changed and constructed through the brake. This was objected to on the part of plaintiffs because of the large quantity of water within the brake. They suggested and thought the change could be made so as to have the levee run around and back of the brake. It was finally agreed that the location of the levee at this point should be changed so as to run back of the brake a distance of 2,600 feet at the farthest point from the line of original location, as shown on the maps and profile mentioned in the contract, and plaintiffs agreed to such change on condition that defendant would provide for the construction of a drainage ditch to drain the brake to the river, some 400 or 500 feet in length. This the chief engineer agreed should be done, and plaintiff agreed to construct the ditch at the same price per cubic yard, and the engineer agreed to procure the right of way. Plaintiffs then constructed the levee as definitely fixed by the engineer in the rear of the brake.

In May, 1905, the defendant was unable, on account of lack of funds, to make cash payment of the 85 per cent. of the work as it progressed, and it was agreed between the plaintiffs and defendant that defendant would give notes for the amount, which should draw interest at 8 per cent., and plaintiffs agreed to accept such notes in lieu of the cash, they having arranged with a bank to discount the notes at par, if they drew interest at 8 per cent., such fact being known to defendant.

Thereafter the Supreme Court of the state rendered a decision to the effect that the defendant was empowered to issue certificates of indebtedness for work done, but that such certificates could only draw interest at the rate of 6 per cent., and defendant issued to plaintiffs, in lieu of cash, certificates drawing 6 per cent. interest, which certificates plaintiffs were required to discount at less than the face value to procure the money with which to continue the work. Defendant was unable to, or did not, procure the right of way for the drainage ditch to the river from the owner of the land through which it should pass, and such ditch was not constructed. The failure to have the drainage ditch caused plaintiffs considerable extra expense and damage to construct the levee over the changed route, the evidence showing it cost some $17,000 more than it would have cost had the ditch been constructed. This action was brought to recover damages which plaintiffs sustained by reason of defendant's failure to provide said drainage ditch, and also for the difference between the face value of the certificates and the amount plaintiffs realized upon their sale. On the trial a verdict and judgment was rendered in favor of plaintiffs and defendant brings the case here by writ of error.

The principal contentions are based upon the assertion that, under the contract, it was the duty of plaintiffs to construct all necessary drains and ditches; that the change in the location of the levee from the river front to the rear of the brake was only a change in the alignment, which the contract provided should be made without any allowance to plaintiffs beyond the final measurement of the work; and that

it was not within the authority of the engineer to modify the contract or make a new one in respect to these matters.

While the word "alignment" means the ground plan of a work, yet, when used in a contract for the construction of such work, to determine the meaning as used and understood by the parties, resort must be had to the entire terms and parts of the agreement. The agreement in question was to construct a levee along the front of the Arkansas river, as shown on maps and profiles, prepared by the defendant. The alignment thus shown was subject to changes within such reasonable limits as might be found desirable as the work progressed, and which would not materially change the character and cost of the work. It did not, however, contemplate a radical change from dry ground, as the evidence established that was where the line was located, as shown on the profile, to a place 2,600 feet distant, where the character of the ground was wet, the earth placed in the embankment retaining the moisture, and the cost of construction increased nearly double. Salt Lake City v. Smith, 104 Fed. 457, 43 C. C. A. 637; Wood v. Wayne, 119 U. S. 312, 7 Sup. Ct. 219, 30 L. Ed. 416; Henderson Bridge Co. v. McGrath, 134 U. S. 260, 10 Sup. Ct. 730, 33 L. Ed. 934. Such radical change would have entitled plaintiffs to recover as damages the entire increased cost of construction. They, however, waived that by consenting to the change upon condition that a ditch would be constructed to drain the brake. It is for a breach of the agreement to cause such drainage upon which plaintiffs found their first cause of action for damages, which we think, under the law and evidence, they are entitled to maintain.

The necessary drains and ditches which the contract provided the plaintiffs should construct were only such drains and ditches as might be required or rendered necessary had the levee been constructed in substantial conformity with the specifications embraced in the contract, and for which defendant should procure the right of way.

The contract empowered the engineer to designate the exact location at which the work was to be prosecuted. He was to explain the specifications when not fully understood by plaintiffs, and the whole work was to be performed under the supervision and to the satisfaction of the chief engineer. Under the by-laws he was given, as we have seen, "supervision of all service, locations, maps and profiles, and estimates of all construction, and such other duties as may properly come within his department." His authority was very broad. He, in fact, stood practically in the place of the board of directors after the contract had been let. Changes in alignment, such as the progress of the work should indicate as necessary or desirable, he was fully authorized to make, and, if emergency required that at some point more extensive drainage was necessary for the proper and successful construction of the work than would have been required had no change in alignment been made, he had full power and authority to provide for the same. While this particular work was not, strictly speaking, required according to the original plans and specifications, it was done in harmony therewith, and was such as the exigencies of the occasion required. It is, however, said that, while the original contract provided that the board of directors should procure the right of way and

earth for constructing the levee, it also provided that "no claim for damage or expense is to be made by the contractor on account of delay or failure in securing such right of way." We think this provision had reference to damages and expense incurred by reason of the contractor's inability to perform the whole work contracted for, on account of delay or failure to procure right of way upon which the levee was to be constructed, and for borrow pits from which the earth could be taken, and does not refer to damages for failure to procure the right of way for such drainage as was required and rendered necessary in this case by reason of the change in alignment. This is apparent when we consider the last clause of the agreement, providing for an extension of time to complete the work upon failure to procure the right of way. It certainly has no application in this case where, as shown by the evidence, notwithstanding plaintiffs had constantly and repeatedly demanded of the engineer that the ditch be located and its construction permitted, the president of the defendant wrote plaintiffs during the progress of this particular work to the effect that, if they did not put on more force and complete that work without unusual delay, the defendant would do so at the expense of plaintiffs. Plaintiffs were thus required to, and did, complete the work at a large increase in the cost.

It is, however, urged that the agreement of the engineer to procure the right of way for this drainage ditch was a new independent agreement, and, as it was not in writing, as required by the by-law of the board, it had no legal effect. We do not think the agreement to procure the right of way such a contract as contemplated by the by-law. The defendant in the contract agreed to procure and furnish all necessary right of way. It was the province of the engineer to determine when and what right of way was required in the proper construction of the work; and, having determined that the change in alignment was necessary and that, because thereof, drainage of the brake was required, his agreeing that the right of way would be procured, was but stating what the specifications required defendant to do, and by the contract he was designated as the person to interpret the specifications. His agreement, then, to procure this right of way for the drainage ditch, was but an assertion that defendant would perform the contract on its part. In doing this he made no new or additional contract, and the by-law referred to had no application to the case.

Again, it is said that, upon the completion of the work, the parties had a full settlement, and that final payment was made and accepted as such. We need not review the conflicting evidence in this regard, as that question was submitted to the jury under proper instructions by the court, and we see no just grounds to disturb their finding.

The court instructed the jury that plaintiffs, under their second cause of action, were entitled to recover the difference between the face value of the certificates and the amount for which they were able to sell them in the market, with interest thereon. This was erroneous. In all contracts for the payment of money the only damages recoverable for a breach of payment within the time specified is interest. Besides, plaintiffs having sold the certificates, the holders are entitled to receive the whole face value from defendant, and plaintiffs cannot,

therefore, recover the discount. Such was the holding in Looney v. District of Columbia, 113 U. S. 258, 5 Sup. Ct. 463, 28 L. Ed. 974. See, also, Savage v. United States, 92 U. S. 382, 23 L. Ed. 660; Insurance Co. v. Piaggio, 16 Wall. 378, 21 L. Ed. 358.

As the amount of the discount was shown to have been $3,333.87, it will not be necessary to reverse the case if a remittitur is entered. The order, therefore, is that, if the plaintiffs shall enter a remittitur upon the record in the court below within 60 days from the filing of this opinion in the sum of $3,333.87, with interest at 6 per cent. from August 25, 1906, and file a copy of the remittitur in this court, the judgment will be affirmed. If such remittitur is not so entered, the judgment will stand reversed, and a new trial granted.